776 F.2d 1384
 54 USLW 2288
 Gladys BISSONETTE, Ellen Moves Camp, Eugene White Hawk,
Marvin Ghost Bear, Edgar Bear Runner, Oscar Bear Runner,
Severt Young Bear, Rachel White Dress, Helen Red Feather,
Eddie White Dress, Vicki Little Moon, Madonna Gilbert,
Lorelei Means, and Carla Blakey, Appellants,
v.
Alexander HAIG, Richard G. Kleindienst, Joseph T. Sneed,
Charles D. Ablard, Joseph H. Trimbach, Ralph E. Erickson,
Harlington Wood, Jr., Kenneth Belieu, Rolland Gleszer,
Edmund Edwards, John Hay, and Volney F. Warner, Appellees.
 No. 84-2617.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 11, 1985.
Decided Nov. 12, 1985.
 
 David E. Engdahl, Seattle, Wash., for appellants.
 Anne M. Gulyassy of the Dept. of Justice, Washington, D.C., for appellees.
 Before ARNOLD, Circuit Judge, PHILLIPS,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 This is an action for damages caused by defendants' alleged violations of the Constitution of the United States. The complaint alleges, among other things, that the defendants seized and confined plaintiffs within an "armed perimeter" by the unlawful use of military force, and that this conduct violated not only a federal statute but also the Fourth Amendment. The use of federal military force, plaintiffs argue, without lawful authority and in violation of the Posse Comitatus Act, 18 U.S.C. Sec. 1385, was an "unreasonable" seizure of their persons within the meaning of the Fourth Amendment. We hold that the complaint states a claim upon which relief may be granted. The judgment of the District Court, dismissing the complaint with prejudice for failure to state a claim, will therefore be reversed, and the cause remanded for further proceedings consistent with this opinion.
 
 I.
 
 2
 This case arises out of the occupation of the village of Wounded Knee, South Dakota, on the Pine Ridge Reservation by an armed group of Indians on February 27, 1973. On the evening when the occupation began, members of the Federal Bureau of Investigation, the United States Marshals Service, and the Bureau of Indian Affairs Police sealed off the village by establishing roadblocks at all major entry and exit roads. The standoff between the Indians and the law-enforcement authorities ended about ten weeks later with the surrender of the Indians occupying the village.[1]
 
 
 3
 In February 1975, the plaintiffs, most of whom at the time of the occupation were residents of the Pine Ridge Indian Reservation, brought this action in the District Court for the District of Columbia alleging that the defendants, who were military personnel or federal officials, conspired to seize and assault them and destroy their property in violation of several constitutional and statutory provisions. In 1981, after the case was transferred to the District of South Dakota,[2] the defendants renewed their motion to dismiss for failure to state a claim. The District Court held that no private right of action exists under 18 U.S.C. Secs. 2, 241, 371, or 1385,[3] and that no claim was stated under the Constitution merely because the persons who allegedly injured the plaintiffs were military personnel instead of civilians. Lamont v. Haig, 539 F.Supp. 552 (D.S.D.1982). The Court gave the plaintiffs 40 days to file an amended complaint, which they did, and the Court again dismissed because the plaintiffs relied exclusively on the theory (rejected by the District Court) that constitutional violations occurred because military personnel and equipment were used to accomplish various seizures, searches, and assaults. Lamont v. Haig, Civil No. 81-5048 (D.S.D. Oct. 18, 1984). The plaintiffs appeal from this last order.
 
 II.
 
 4
 In their amended complaint, plaintiffs allege three sets of substantive claims. First, they claim that they were unreasonably seized and confined in the village of Wounded Knee contrary to the Fourth Amendment and their rights to free movement and travel.[4] Second, they claim that they were unreasonably searched by ground and aerial surveillance. In both cases, plaintiffs assert that the seizures and searches were unreasonable because "Defendants accomplished or caused to be accomplished those actions by means of the unconstitutional and felonious use of parts of the United States Army or Air Force...." Designated Record (D.R.) at 36. Third, plaintiffs claim they were assaulted, deprived of life in one instance, and deprived of property contrary to their rights under the Fifth and Eighth Amendments. Again, plaintiffs allege that these actions were unconstitutional "for the reason that the arms used in the force or threat of force were parts of the United States Army or Air Force...." D.R. at 41. This case comes to us on appeal from a dismissal for failure to state a claim, and we therefore accept for present purposes the factual allegations of the complaint.
 
 
 5
 These allegations must be viewed against the background of the Posse Comitatus Act of 1878, 18 U.S.C. Sec. 1385, which plaintiffs claim was violated here. The statute provides:
 
 
 6
 Sec. 1385. Use of Army and Air Force as posse comitatus
 
 
 7
 Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.
 
 A.
 
 8
 The first two sets of claims raise the question whether a search or seizure, otherwise permissible, can be rendered unreasonable under the Fourth Amendment because military personnel or equipment were used to accomplish those actions. We believe that the Constitution, certain acts of Congress, and the decisions of the Supreme Court embody certain limitations on the use of military personnel in enforcing the civil law, and that searches and seizures in circumstances which exceed those limits are unreasonable under the Fourth Amendment.
 
 
 9
 The Supreme Court has recently indicated that a seizure can be unreasonable even if it is supported by probable cause. Tennessee v. Garner, --- U.S. ----, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (seizure with deadly force of fleeing burglar who was apparently unarmed is unreasonable under the Fourth Amendment, whether or not probable cause exists to believe the fugitive has committed a crime). Reasonableness is determined by balancing the interests for and against the seizure. 105 S.Ct. at 1699-1700. Usually, the interests arrayed against a seizure are those of the individual in privacy, freedom of movement, or, in the case of a seizure by deadly force, life. Here, however, the opposing interests are more societal and governmental than strictly individual in character. They concern the special threats to constitutional government inherent in military enforcement of civilian law. That these governmental interests should weigh in the Fourth Amendment balance is neither novel nor surprising. In the typical Fourth Amendment case, the interests of the individual are balanced against those of the government. See, e.g., Tennessee v. Garner, 105 S.Ct. at 1700. That some of those governmental interests are on the other side of the Fourth Amendment balance does not make them any less relevant or important.[5]
 
 
 10
 Civilian rule is basic to our system of government. The use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties. On a lesser scale, military enforcement of the civil law leaves the protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights. It may also chill the exercise of fundamental rights, such as the rights to speak freely and to vote,[6] and create the atmosphere of fear and hostility which exists in territories occupied by enemy forces.
 
 
 11
 The interest in limiting military involvement in civilian affairs has a long tradition beginning with the Declaration of Independence and continued in the Constitution, certain acts of Congress, and decisions of the Supreme Court. The Declaration of Independence states among the grounds for severing ties with Great Britain that the King "has kept among us, in times of peace, Standing Armies without Consent of our Legislature ... [and] has affected to render the Military independent of and superior to the Civil power." These concerns were later raised at the Constitutional Convention. Luther Martin of Maryland said, "when a government wishes to deprive its citizens of freedom, and reduce them to slavery, it generally makes use of a standing army."[7]
 
 
 12
 The Constitution itself limits the role of the military in civilian affairs: it makes the President, the highest civilian official in the Executive Branch, Commander in Chief of the armed services (Art. II, Sec. 2); it limits the appropriations for armed forces to two years and grants to the Congress the power to make rules to govern the armed forces (Art. I, Sec. 8, cl. 14); and it forbids the involuntary quartering of soldiers in any house in time of peace (Third Amendment).
 
 
 13
 Congress has passed several statutes limiting the use of the military in enforcing the civil law. As already noted, 18 U.S.C. Sec. 1385 makes it a crime for anyone, "except in cases and circumstances expressly authorized by the Constitution or Act of Congress ... [to use] any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws." Title 10 U.S.C. Secs. 331-335 delimit the circumstances under which the President may call upon the national guard or military to suppress insurrection or domestic violence. See also 32 C.F.R. Sec. 215 (1984).[8]
 
 
 14
 The Supreme Court has also recognized the constitutional limitations placed on military involvement in civilian affairs. A leading case is Ex parte Milligan, 4 Wall. 2, 124, 71 U.S. 2, 124, 18 L.Ed. 281 (1866), a Civil War case where the Court held that military commissions had no authority to try civilians in States not engaged in rebellion, in which the civil courts were open. More recently, in Laird v. Tatum, 408 U.S. 1, 15-16, 92 S.Ct. 2318, 2326-27, 33 L.Ed.2d 154 (1972), statements the Court made in dicta reaffirm these limitations:
 
 
 15
 The concerns of the Executive and Legislative Branches ... reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable injury resulting from military instrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.
 
 
 16
 The governmental interests favoring military assistance to civilian law enforcement are primarily twofold: first, to maintain order in times of domestic violence or rebellion; and second, to improve the efficiency of civilian law enforcement by giving it the benefit of military technologies, equipment, information, and training personnel. These interests can and have been accommodated by acts of Congress to the overriding interest of preserving civilian government and law enforcement. At the time of the Wounded Knee occupation, Congress had prohibited the use of the military to execute the civilian laws, except when expressly authorized. 18 U.S.C. Sec. 1385. And it had placed specific limits on the President's power to use the national guard and military in emergency situations. 10 U.S.C. Secs. 331-335. For example, under 10 U.S.C. Sec. 332, the President may call upon the military only after having determined that domestic unrest makes it "impracticable to enforce the laws of the United States by the ordinary course of judicial proceedings," and under 10 U.S.C. Sec. 334, he may do so only after having issued a proclamation ordering the insurgents to disperse. Those steps were not taken here.
 
 
 17
 We believe that the limits established by Congress on the use of the military for civilian law enforcement provide a reliable guidepost by which to evaluate the reasonableness for Fourth Amendment purposes of the seizures and searches in question here. Congress has acted to establish reasonable limits on the President's use of military forces in emergency situations, and in doing so has circumscribed whatever, if any, inherent power the President may have had absent such legislation.[9] This is the teaching of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). There the President attempted to justify his seizure of the steel mills on grounds of inherent executive power to protect national security. Justice Black, writing for the Court, rejected this assertion of executive authority, and in addition four of the five judges concurring in the Court's opinion or judgment wrote separate opinions expressing the view that Congress had precluded the exercise of inherent executive authority by specifically refusing to give the President the power of seizure. 343 U.S. at 602, 72 S.Ct. at 893 (Frankfurter, J., concurring), 637-38, 72 S.Ct. at 871 (Jackson, J., concurring), 660, 72 S.Ct. at 882 (Burton, J., concurring), 662, 72 S.Ct. at 883 (Clark, J., concurring in the judgment).
 
 B.
 
 18
 The District Court took the view that there is no "separate private cause of action for damages for the involvement of military personnel simply because they were military personnel...." Lamont v. Haig, supra, 539 F.Supp. at 560 (emphasis in original). In large part, we agree. As will be seen shortly when we come to discuss plaintiff's allegations under the Due Process Clause of the Fifth Amendment, the essence of due process is that no governmental power, civilian or military, may be used to restrain the liberty of the citizen or seize his property otherwise than in accordance with the forms of law, including, in most instances, judicial proceedings. In the context of the Fourth Amendment, however, we believe plaintiffs' theory that the use of military force is in a class by itself has merit. The legal traditions which we have briefly summarized establish that the use of military force for domestic law-enforcement purposes is in a special category, and that both the courts and Congress have been alert to keep it there. In short, if the use of military personnel is both unauthorized by any statute, and contrary to a specific criminal prohibition, and if citizens are seized or searched by military means in such a case, we have no hesitation in declaring that such searches and seizures are constitutionally "unreasonable." We do not mean to say that every search or seizure that violates a statute of any kind is necessarily a violation of the Fourth Amendment. But the statute prohibiting (if the allegations in the complaint can be proved) the conduct engaged in by defendants here is, as we have attempted to explain, not just any act of Congress. It is the embodiment of a long tradition of suspicion and hostility towards the use of military force for domestic purposes.
 
 
 19
 Plaintiffs' Fourth Amendment case, therefore, must stand or fall on the proposition that military activity in connection with the occupation of Wounded Knee violated the Posse Comitatus Act.
 
 
 20
 In United States v. Casper, 541 F.2d 1275 (8th Cir.1976) (per curiam), cert. denied, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), we specifically held that military assistance given to civilian authorities at Wounded Knee did not violate this statute. (Surprisingly, neither side cites or discusses Casper in its brief on this appeal.) In Casper, several defendants who were convicted of attempting to interfere with United States Marshals and FBI agents during the Wounded Knee disorder appealed their convictions on the ground that the District Court had erred in rejecting their defense that the federal officials allegedly interfered with had been acting in violation of the Posse Comitatus Act. Specifically, the District Court had found on a stipulated record that the following activities did not violate the Act: the use of Air Force personnel, planes, and cameras to fly surveillance; the advice of military officers in dealing with the disorder; and the furnishing of equipment and supplies. United States v. McArthur, 419 F.Supp. 186, 194-95 (D.N.D.1976). We affirmed "on the basis of the trial court's thorough and well-reasoned opinion." 541 F.2d at 1276.
 
 
 21
 Plaintiffs in the present civil action were not parties in this prior criminal case, nor were defendants here, with perhaps one or two exceptions, among the federal officials with whom interference was charged in the criminal prosecution. Therefore, our judgment in Casper does not estop plaintiffs to relitigate the question whether a violation of the Posse Comitatus Act occurred at Wounded Knee. Casper does, however, stand as a binding precedent in this Circuit on the interpretation of the Act. Therefore, unless plaintiffs now allege that the defendants took actions that went beyond those alleged in the Casper case, the actions alleged in the complaint now before us cannot violate the Act.
 
 
 22
 In Casper, quoting from Judge VanSickle's opinion for the District Court, 419 F.Supp. at 194, we approved the following standard for determining whether a violation of the Posse Comitatus Act had occurred:
 
 
 23
 Were Army or Air Force personnel used by the civilian law enforcement officers at Wounded Knee in such a manner that the military personnel subjected the citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature, either presently or prospectively?
 
 
 24
 541 F.2d at 1278. This formulation, see 419 F.Supp. at 194 n. 4, is based on language found in the Supreme Court's opinion in Laird v. Tatum, 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972). Laird involved a claim that First Amendment rights were chilled by the existence of a data-gathering system maintained by Army Intelligence, a system described by plaintiffs in that case as involving the surveillance of lawful civilian political activity. The Court rejected this claim on the ground that no justiciable controversy existed. It held that the mere existence of this challenged data-gathering system infringed no rights of plaintiffs, since there had been no showing of objective harm or threat of specific future harm.
 
 
 25
 When this concept is transplanted into the present legal context, we take it to mean that military involvement, even when not expressly authorized by the Constitution or a statute, does not violate the Posse Comitatus Act unless it actually regulates, forbids, or compels some conduct on the part of those claiming relief. A mere threat of some future injury would be insufficient. In addition, our affirmance of the District Court's judgment in McArthur and our description of its opinion as "thorough and well reasoned," 541 F.2d at 1276, must also mean that the mere furnishing of materials and supplies cannot violate the statute. The same thing is true, as we have previously noted, of the use of military personnel, planes, and cameras to fly surveillance and the advice of military officers in dealing with the disorder, advice, that is, as distinguished from active participation or direction.
 
 
 26
 The question becomes, then, whether the present complaint alleges more than these kinds of activities. "In appraising the sufficiency of the complaint, we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957) (footnote omitted). We are not persuaded that this stringent requirement for dismissal on the pleadings has been met here. We of course have no way of knowing what plaintiffs would be able to prove if this case goes to trial, but the complaint, considered simply as a pleading, goes well beyond an allegation that defendants simply furnished supplies, aerial surveillance, and advice. It specifically charges that "the several Defendants maintained or caused to be maintained roadblocks and armed patrols constituting an armed perimeter around the village of Wounded Knee...." Paragraph 17(a), D.R. 33. Defendants' actions, it is charged, "seized, confined, and made prisoners [of plaintiffs] against their will...." Paragraph 18, D.R. 34. These allegations amount to a claim that defendants' activities, allegedly in violation of the Posse Comitatus Act, were "regulatory, proscriptive, or compulsory," in the sense that these activities directly restrained plaintiffs' freedom of movement. No more is required to survive a motion to dismiss. We hold, therefore, that plaintiffs' first set of claims, alleging an unreasonable seizure in violation of the Fourth Amendment because of defendants' confinement of plaintiffs within an armed perimeter, does state a cause of action.[10]
 
 
 27
 As to the second set of claims, we hold that they do not state a cause of action. In these claims, set out in paragraph 24 of the complaint, D.R. 38, plaintiffs charge that they were searched and subjected to surveillance against their will by aerial photographic and visual search and surveillance. As we have already noted, Casper holds that this sort of activity does not violate the Posse Comitatus Act. It is therefore not "unreasonable" for Fourth Amendment purposes. In addition, there is no allegation that this aerial surveillance occurred "in the area immediately surrounding the home" or in an area where plaintiffs had a legitimate expectation of privacy. See Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (no legitimate expectation of privacy for activities occurring in an open field; aerial surveillance of such an area, even if involving a trespass under state property law, is not an unreasonable search).
 
 C.
 
 28
 The third set of claims invokes the Due Process Clause of the Fifth Amendment. Plaintiffs argue that they were deprived of liberty, property, and, in the case of the son of one of the plaintiffs, life without due process of law. In the ordinary case, a claimed lack of due process relates to the absence of a notice and hearing or certain other procedural deficiencies. Plaintiffs' theory here is quite different. They claim a due-process violation by reason of the mere fact that the confinement and other deprivations inflicted upon them derived from military action instead of civilian. Plaintiffs cite a number of 19th-century cases which they say supports this view. E.g., Ex parte Merryman, 17 Fed.Cas. 144 (No. 9487) (Taney, C.J., in chambers) (1861). We have carefully examined each of these authorities and find in them no clear support for the novel theory advocated by plaintiffs. In Merryman, for example, the Chief Justice did mention the Due Process Clause of the Fifth Amendment, and the petitioner in that habeas corpus proceeding was in military custody, but the result in the case would have been exactly the same had the custody been civilian, because Merryman was seized and imprisoned without any judicial process. It was the absence of that process, rather than the military character of Merryman's custodian, that caused the Chief Justice to take the view that the petitioner was unconstitutionally confined.
 
 
 29
 Most of the other cases relied on by plaintiffs, as the District Court persuasively explained, 539 F.Supp. at 559-60, are ordinary tort actions in which the defendants set up as a defense that they were acting pursuant to military authority. Plaintiffs then contested the validity of this defense, and the courts sided with plaintiffs, but these holdings seem to be based rather on the theory that under the circumstances of each case the assertion of military power was simply unauthorized, rather than on any limitation on military power stemming from the Due Process Clause of the Fifth Amendment. To be sure, the proposition that a power delegated to an officer of the federal government cannot be exercised in such a way as to conflict with the Due Process Clause of the Fifth Amendment is not far removed from the proposition that no such power was ever delegated in the first place. See Youngstown Sheet & Tube Co. v. Sawyer, supra, 343 U.S. at 646, 72 S.Ct. at 875 (Jackson, J., concurring). The two legal theories, however, remain analytically distinct, and plaintiffs' complaint here is clearly grounded on the due-process theory that an action by a military officer can violate the Fifth Amendment even though exactly the same thing, if done by a civilian federal official, would not. With this proposition we do not agree, nor do we believe that plaintiffs, ten years after the filing of their complaint, should be allowed to espouse a new theory of constitutional relief.
 
 
 30
 Our decision to reject plaintiffs' due-process theory is reinforced by the knowledge that all of the proof relevant under such a theory will still come in if and when the Fourth Amendment search-and-seizure theory goes to trial. In other words, plaintiffs do not really need the due-process theory in order to secure relief here, the Court having already held that an unauthorized action by a military officer can be "unreasonable" under the Fourth Amendment even though the same thing, if done by a civilian official, would not.
 
 III.
 
 31
 The defendants argue that the dismissal of the plaintiffs' claims can be affirmed on two alternative grounds: first, that certain of the defendants were not properly served; second, that the action is barred by the statute of limitations. We decline to reach either issue at this time. The service-of-process issue has not been ruled on by the District Court. No materials on the issue were included in the designated record, and no factual findings of the District Court with respect to it are available for review. The limitations question is also not sufficiently developed for appellate review. It is primarily based on the claim that the plaintiffs' action was not commenced within the statutory period because the defendants have not been properly served. This argument again requires reference to materials concerning service that are not part of the record on appeal. Defendants are of course free to renew these defenses on remand.
 
 IV.
 
 32
 In short, we hold that with one exception the District Court correctly ruled that the complaint failed to state a claim. This exception relates to the allegation that defendants seized and confined plaintiffs within an armed perimeter, that these actions were not authorized by law and were a violation of the Posse Comitatus Act, and that, therefore, an "unreasonable" seizure within the meaning of the Fourth Amendment took place. As to this single theory, we hold that the complaint states a claim on which relief can be granted. On remand, further proceedings consistent with this opinion will take place. We note that the alleged wrongs complained of by plaintiffs occurred in 1973, and that their original complaint was filed on February 27, 1975. It has taken more than ten years to litigate the question whether the complaint is sufficient as a matter of pleading. The history of this case reflects no credit either on the lawyers or on the courts. We ask the District Court, on remand, to act with dispatch in conducting whatever further proceedings are appropriate.
 
 
 33
 Reversed and remanded with instructions.
 
 
 
 *
 The Hon. Harry Phillips, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation. Judge Phillips took part in the oral argument and subsequent conferences of the panel, at which all three judges voted to hold that the complaint stated a claim. He died before this opinion was circulated
 
 
 [1]
 Several of these facts are not contained in the record on appeal. However, they are referred to in a previous decision of our Court, United States v. Casper, 541 F.2d 1275, 1277 n. 4 (8th Cir.1976) (per curiam), cert. denied, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), and we present them here only as background information
 
 
 [2]
 The action was initially dismissed on the ground of improper venue. The District of Columbia Circuit reversed and remanded. Lamont v. Haig, 590 F.2d 1124 (D.C.Cir.1978). After further proceedings on remand on the question of venue, the District Court for the District of Columbia transferred the case to the District of South Dakota
 
 
 [3]
 This holding is no longer in dispute. On this appeal, plaintiffs base their asserted right of action on the Constitution itself, not on any statute as such
 
 
 [4]
 The defendants do not challenge the legal sufficiency of the plaintiffs' allegation that they were "seized" by the encirclement of the village. The Supreme Court has recently stated that a seizure occurs "[w]henever an officer restrains the freedom of a person to walk away." Tennessee v. Garner, --- U.S. ----, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)
 
 
 [5]
 In identifying the interests opposing a seizure by deadly force in Tennessee v. Garner, the Court specifically alluded to the "interest ... of society, in judicial determination of guilt and punishment." 105 S.Ct. at 1700. This gives clear indication that the interests that a court may consider in determining the reasonableness of a seizure are not limited to an individual's interests in privacy, freedom of movement, and life, but may encompass broader social and governmental concerns as well
 
 
 [6]
 Congress has in fact passed two criminal statutes specially dealing with military intimidation at voting places. 18 U.S.C. Secs. 592, 593
 
 
 [7]
 M. Farrand, Records of the Federal Convention 209 (1911), quoted in Laird v. Tatum, 408 U.S. 1, 18, 92 S.Ct. 2318, 2328, 33 L.Ed.2d 154 (1972) (Douglas, J., concurring)
 
 
 [8]
 In 1981 Congress passed legislation which specifies the circumstances under which the provision of indirect military assistance is permitted. 10 U.S.C. Secs. 371-378; see also 32 C.F.R. Sec. 213.10 (1984). We do not believe that this legislation is relevant to the reasonableness of the searches and seizures here, because they occurred over eight years before it was passed
 
 
 [9]
 See Note, Honored in the Breech: Presidential Authority to Execute the Laws with Military Force, 83 Yale L.J. 130, 132-37 (1973)
 
 
 [10]
 Since plaintiffs have stated a claim under the Fourth Amendment for unreasonable seizures, we need not also determine whether the complaint sufficiently alleges a violation of plaintiffs' constitutional right to travel. This right, even if applicable, is substantially covered by the Fourth Amendment claim. Plaintiffs' broad allegations will be subject to dismissal on a motion for summary judgment if they are unable to produce any evidence or affidavits showing that defendants' conduct here went beyond that before us in Casper