United States Court of Appeals,

Eleventh Circuit.

No. 95-8873.

Fanny M. RILEY, as Administratrix of the Estate of Ralph E. Lowe, deceased;  Fanny M. Riley, as next friend for the children of the deceased, Ralph E. Lowe, as the next of kin under the laws of the State of Georgia, Plaintiffs-Appellants-Cross-Appellees,

v.

Patrick NEWTON, individually and in his official capacity as a de facto officer with the Richmond County Sheriff's Department, and in his official capacity as a de facto officer with the U.S. Military Drug Suppression Team, Defendant-Appellee,

Department of the Army, Defendant,

 Richmond County, Georgia;  Charles Webster, individually and in his official capacity as the Sheriff of Richmond County, Georgia, Defendants-Appellees-Cross-Appellants,

 Kenneth J. Glisson, individually and in his official capacity as an officer with the Richmond County Sheriff's Department, Defendant-Appellee,

    Dave Padron;  Tim Padron;  Steve Green;  United States of America, Defendants.

Sept. 11, 1996.

Appeals from the United States District Court for the Southern District of Georgia. (No. CV 191-171), Dudley H. Bowen, Jr., Judge.

Before KRAVITCH and BIRCH, Circuit Judges, and SCHWARZER[*], District Judge.

SCHWARZER, Senior District Judge:

Ralph Lowe was accidentally shot and killed while being arrested by Patrick Newton, a military policeman, who was accompanying Richmond County Inspector Kenneth Glisson on patrol. Lowe's estate and his surviving children allege claims under 42 U.S.C. § 1983 (1988) against Glisson, Richmond County Sheriff

---

[*]Honorable William W. Schwarzer, Senior U.S. District Judge for the Northern District of California, sitting by designation.

Charles Webster, and the County.  Claims against the United States and other participants in the events that led to Lowe's death have been resolved and are not before us.

The section 1983 claims allege that Lowe was seized without probable cause and subjected to excessive force in violation of the First, Fourth, Fourteenth, and Thirteenth Amendments.  The district court granted Glisson's motion for summary judgment, as well as Webster's, limited to his individual capacity;  it denied the County's motion and Webster's motion in his official capacity.  Plaintiffs appeal from the order granting Glisson's motion, and the County and the Sheriff, pursuant to leave granted by this court, cross-appeal from the denial of their motions.  We have jurisdiction under 28 U.S.C. § 1291 and affirm the summary judgment for Glisson and for Sheriff Webster in his individual capacity.  We reverse the order denying summary judgment for Richmond County and for Sheriff Webster in his official capacity and remand with directions to enter judgment for all defendants.

## STANDARD OF REVIEW

We review the granting or denial of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving parties.  *Swint v. City of Wadley, Alabama,* 51 F.3d 988, 992 (11th Cir.1995);  *Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381, 1384 (11th Cir.1993).  If a genuine issue of material fact exists, summary judgment must be denied.  *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993).

## FACTS

On the evening of September 2, 1989, as Inspector Glisson

prepared to depart on his regular patrol, he received a call from Sgt. David Padron, an investigator on the Drug Suppression Team (DST) at Ft. Gordon, a nearby Army installation. Padron asked to ride with Glisson to check out local hotels for military personnel. Padron asked Glisson if his brother, who was visiting him, could ride along. Glisson agreed so long as the brother remained in the vehicle, did not carry a weapon, and would be Padron's responsibility. When Glisson met Padron and his brother that night at the sheriff's substation, SPC. Patrick Newton was also there. A former member of the DST, he was assigned to the military police at Ft. Gordon and worked as a confidential source for the DST. He came along to point out individuals whom he had earlier observed dealing drugs.

Ft. Gordon is a large Army installation in Richmond County. To deal with the proliferation of drugs, the military police at Ft. Gordon formed the DST to investigate drug use and trafficking among military personnel. The DST and personnel of the Richmond County Sheriff's Department cooperated informally in particular criminal matters touching on off-base activities involving military personnel. Padron and Newton rode with Glisson from time to time when engaged in drug investigations. Glisson was aware that the team members' authority was limited to assisting in investigations having a military connection and did not extend to investigations or making of arrests in the civilian community.

That evening, Glisson was dispatched to the Barton Village area of Augusta to respond to a complaint of a loud party. Barton Village was known to be one of the most dangerous areas in the city

due to extensive drug trafficking and violence. On arrival at Barton Village, Glisson spoke to the person throwing the party and resolved the complaint without trouble. As he resumed his patrol at about 10:30 or 11:00 p.m., he observed a white male in a pickup truck driving through Barton Village. The truck stopped at a corner and the driver began to speak with a black male standing at the corner. After a few seconds, the black male got into the vehicle with the white male. Glisson recognized this incident as typical of a street-corner drug deal, a scenario he had seen repeatedly. He decided to make an investigatory stop. As he turned on his blue lights, the truck pulled over to the curb and stopped. When Glisson and the others got out of the car, however, the truck sped away. Glisson and Newton jumped back into the car and Glisson gave chase. He cut in front of the truck, forcing it to stop.

Glisson then exited the car and, with his revolver drawn, approached the truck on the driver's side. He repeatedly instructed the driver (later identified as Steven Green) to turn off the ignition and show his hands but the driver did not comply. When he reached the truck, Glisson opened the door, reached in and pulled the driver out, and placed him on the ground. At this point, Padron came up and handed him handcuffs which he snapped on Green.

Glisson then returned to his car to turn off the siren and call for a transport unit. As he passed the window on the truck, he observed that Newton was straddling the passenger (later identified as Ralph Lowe, plaintiffs' deceased) on the ground while

attempting to handcuff him. Glisson saw them struggling; Lowe had one hand handcuffed and the other free. As he moved toward his car, he heard a shot. He then heard the man on the ground say "You shot me." Newton turned to Glisson and said, "He hit my gun and it went off." Glisson then returned to his car and called for an ambulance and for Maj. Ronnie Strength of the Sheriff's Department.

## INSPECTOR GLISSON'S INDIVIDUAL LIABILITY

*Excessive Force.* While the district court opinion, and much of the discussion in the parties' briefs, focuses on the legality of the initial and subsequent stops, the crucial issue is whether Glisson can be held liable for Newton's seizure of and use of force on Lowe for which plaintiffs seek relief. The district court granted summary judgment on all claims challenging the legality of the two stops of Green's truck. We need not address the issues relating to the stops, however, because they are not relevant to Glisson's liability for Newton's acts.

Plaintiffs concede that Newton acted "without any explicit direction from Glisson." (P. Br. 16.) But they argue (apparently for the first time on appeal) that Glisson "was either idly standing by or failed to supervise Newton." *Id.* This court has held that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1442 (11th Cir.1995). Plaintiffs have come forward with no facts from which a jury could find that Glisson failed to take reasonable steps to protect Lowe from excessive force. The undisputed facts establish

that Glisson was engaged in making the arrest of Green while Newton, on his own, was dealing with Lowe. They were on opposite sides of the truck. When he saw Newton struggling with Lowe, Glisson observed no use of excessive force which might have given rise to a duty to intervene to stop it, nor did he have an indication of the prospective use of excessive force—none occurred until Newton's weapon fired. Because Glisson had no reason to expect the use of excessive force until after it had occurred, he had no reasonable opportunity to protect Lowe, and the obligation to take steps to protect him never arose. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11-12 (2d Cir.1988) ("The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.")

*The Posse Comitatus Act.* Plaintiffs' principal contention is that Glisson and the other defendants violated the Posse Comitatus Act. That Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, wilfully uses any part of the Army or the Air Force as a *posse comitatus* or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (1988).

The district court held that Glisson was entitled to qualified immunity on this claim and we agree. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no "clearly

established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law." *Lassiter,* 28 F.3d at 1149 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).

The law of this circuit has not been developed to make it obvious to law enforcement officers what constitutes "wilful use" of the Army "to execute the laws." Specifically, our case law does not make obvious what activities constitute "executing the law" for purposes of the Act; it does not delineate at what point or under what circumstances a joint investigation with military personnel would violate the Posse Comitatus Act. And even more importantly here, our case law does not give any guidance as to what constitutes "wilful use" in the event that the military person's actions would clearly constitute "executing the law."

This court was first faced with a possible violation of the Posse Comitatus Act in *United States v. Hartley,* 678 F.2d 961, 978 n. 24 (11th Cir.1982), *aff'g* 486 F.Supp. 1348 (M.D.Fla.1980), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983), *and cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). In *Hartley,* we held that the Act was not violated where military

inspectors assisted civilian employees in investigating activities devised to defraud the government. *Hartley,* 678 F.2d at 978 (military assistance in the form of handling and testing of shrimp after it had been shipped to government warehouses). In so holding, the court cited three different tests that had been articulated in the Eighth Circuit[1] and cited by the district court in *Hartley:* "(1) whether civilian law enforcement officials had made "direct active use' of the military to "execute the laws;' (2) whether the use of the military "pervaded the activities' of the civilian officials; or (3) whether the military was used so as to subject "citizens to the exercise of military power which was regulatory, proscriptive, or compulsory.' " *Hartley,* 678 F.2d at 978 n. 24; *see United States v. McArthur,* 419 F.Supp. 186 (D.N.D.) (setting out the three different tests), *aff'd sub nom. United States v. Casper,* 541 F.2d 1275 (8th Cir.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Applying these

---

[1]The Eighth Circuit also considered the Act in *Bissonette v. Haig,* 776 F.2d 1384 (8th Cir.1985); *aff'd en banc,* 800 F.2d 812 (8th Cir.1986), *aff'd,* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988). In that case, plaintiffs sought damages based on federal officials' alleged violation of the Fourth Amendment in connection with the occupation of the village of Wounded Knee by federal authorities, including the United States Army. The court held that an allegation of violation of the Act was sufficient to state a *Bivens* claim under the Fourth Amendment. Putting aside the thorny question whether we may look to the law of other circuits to determine whether clearly established law was violated, *see Hansen v. Soldenwagner,* 19 F.3d 573, 578 n. 6 (11th Cir.1994), *Bisonnette* could not be said to clearly establish the law as to whether the situation at issue here constituted a violation of the Posse Comitatus Act. *Bissonette* passes on the sufficiency of allegations in a complaint; it provides no guidance to one in Glisson's position whose military passenger, lawfully present on a joint drug patrol, attempts on his own initiative to make an arrest that leads to the application of excessive force.

tests in *United States v. Bacon,* 851 F.2d 1312 (11th Cir.1988), we held that the Act was not violated where an Army investigator aided civilian personnel in a drug investigation because the military participation "did not pervade the activities of the civilian officials, and did not subject the citizenry to the regulatory exercise of military power." *Id.* at 1314 (army investigator assumed undercover role in drug "buys," army funds were used for some of the buys, and army investigator turned over to local authorities drugs and other evidence to assist in the prosecution of a civilian defendant). These cases make clear that, at least under some circumstances, joint investigations with the military do not constitute violations of the Posse Comitatus Act. Thus, merely allowing Newton to ride along to investigate possible drug activity was not a violation of clearly established law.

Our case law does not speak to whether a joint investigation which culminates in the military person arresting a civilian is a violation of the Posse Comitatus Act. Assuming, however, that a *willful use* of a military person to make an arrest would be a violation of the Act under the plain words of the statute (as making an arrest would seem to be a quintessential execution of the law), no case law makes it clear that Glisson could be said to have *wilfully used* Newton to make an arrest. The evidence fails to show that Glisson at any point instructed or encouraged Newton to assist him in the arrests; instead Newton became involved in arresting Lowe upon Newton's own initiative. Absent case law defining "wilful use" as the failure to prevent military personnel from making arrests when participating in a joint investigation, Glisson

cannot be said to have violated clearly established law.

Because no reported decisions "make it obvious to ... [one] in the defendant's place, that "what he [was] doing' violates federal law," *Lassiter,* 28 F.3d at 1149, we hold that Glisson was entitled to qualified immunity.

### SHERIFF WEBSTER'S INDIVIDUAL LIABILITY

The district court held that Sheriff Webster was entitled to summary judgment in his individual capacity and we agree. Defendants concede that Sheriff Webster did not personally participate in any actions leading to the seizure and death of Lowe. But they contend that he may be held liable in his individual capacity for acts or omissions which proximately led to the violation of Lowe's rights, specifically, that the Sheriff should have trained his deputies in the proper use of military personnel who would be working with them.

Like Glisson, Webster is protected by qualified immunity if "[his] conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lassiter,* 28 F.3d at 1149 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). Plaintiffs cite to no law or constitutional right that required Webster to train the Department on how to use Army personnel. Instead, plaintiffs point to *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989). That case, however, provides the standard for when a *municipality* can be held liable for a failure to train in general; it does not speak at all to when an individual is responsible for failure to train his subordinates, much less require that a sheriff

train a department on how to use Army personnel. *See id.* ("For the law to be clearly established to the point that qualified immunity does not apply, the law must [be] concrete and factually defined....") (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Plaintiffs having cited no specific law which Webster's inaction might have violated, he is entitled to immunity from suit.

OFFICIAL LIABILITY OF SHERIFF WEBSTER AND THE COUNTY

*Constitutional violation.* Plaintiffs' claims are based on alleged violations of section 1983. "Local government may not be sued under § 1983 ... [unless] execution of a government's policy or custom ... inflicts the injury...." *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1977). The district court misconceived the basis of municipal liability when it denied summary judgment on the ground that there was "a genuine issue of material fact as to whether the County used Newton as a de facto deputy on September 2, 1989 ... [and] whether Richmond County officials ever approved of or acquiesced in Newton's choice of weapon." Under *Monell,* liability cannot be imposed on a *respondeat superior* theory. The County's use of Newton on September 2, or its lack of oversight of his choice of weapon, could not establish the existence of a policy or custom to use the military to enforce the law in violation of the Posse Comitatus Act or of any other policy or custom, much less one that may have "caused" the county's officials to subject plaintiffs to the injury complained of. *See Monell,* 436 U.S. at 692, 98 S.Ct. at 2036-37. Plaintiffs have failed to come forward with facts from

which a jury could find the existence of any policy or custom leading to a violation of plaintiffs' constitutional rights.

Nor have plaintiffs come forward with facts to support their claim that the County violated section 1983 by failing to train its personnel, in particular Glisson, regarding the use of military personnel to enforce civil law. The district court, relying on Glisson's testimony that he had not received instructions with respect to the use of DST personnel and Newton, denied summary judgment because "Defendants have not established that this deficient training ... did not cause the alleged deprivation of Lowe's constitutional rights." However, a section 1983 claim for inadequate training exists "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton,* 489 U.S. at 388, 109 S.Ct. at 1204. The failure to train must reflect a "deliberate" or "conscious" choice and the deficiency "must be closely related to the ultimate injury." *Id.* at 389, 391, 109 S.Ct. at 1205, 1206. Failure to train only becomes "deliberate" where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at 1205. No facts to sustain such a jury finding have been offered.

*Summary judgment.* The district court held that if Newton acted as a de facto deputy of the County and "if the shooting was the result of a County policy, practice and custom, the County and

Webster may be liable."  To deny summary judgment on that ground, however, the court would have had to determine that plaintiffs had raised a genuine issue of material fact by coming forward with evidence from which a jury could find the existence of such a policy, practice, or custom.  Instead, the court placed the burden on defendants, denying summary judgment because "Defendants have failed to carry their burden of establishing that there are no genuine issues of material fact regarding Plaintiffs' claim that Richmond County had a custom of using Patrick Newton as a de facto deputy and of allowing him to use a MAC 11 ... [and] Defendants have not established that this custom, if it existed, was not the moving force behind the alleged deprivation of Lowe's constitutional rights."

The ruling below reflects a misconception of the summary judgment procedure.  The Supreme Court has made it clear that Rule 56 does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 2553, 2554, 91 L.Ed.2d 265 (1986) ("[T]he *Adickes* [*v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ] language quoted above should [not] be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact....  [T]he burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").  In *Ryder Intern. Corp. v. First Am. Nat. Bank,* 943 F.2d 1521, 1523

(11th Cir.1991), this court said that "[s]ummary judgment should be granted ... when, after adequate time for discovery and upon motion, a party fails to make a sufficient showing to establish the existence of an element essential to that party's case on which the party bears the burden of proof at trial."  In *Hammer v. Slater,* 20 F.3d 1137 (11th Cir.1994), we said that "[f]or issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence "sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.' "  *Id.* at 1141 (quoting *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116-17 (11th Cir.1993)).  And in *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989), we said:  " "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.' ....  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather, as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action.' "  *Id.* at 257 (quoting *Celotex,* 477 U.S. at 323, 327, 106 S.Ct. at 2552-53, 2554-55).

In denying the motions of these defendants for summary judgment, the district court applied incorrect legal standards and erroneously shifted the burden of producing issuable facts. Because the record shows that defendants are entitled to judgment, we remand with directions to enter judgment in their favor.

AFFIRMED in part, REVERSED in part.