[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2003
THOMAS K. KAHN
CLERK

No. 01-14621
_____

D. C. Docket No. 00-00001 CV-DF-3

ROMEO CARR,
CEDRICK WYMBS,

Plaintiffs-Appellants,

versus

JOSEPH TATANGELO,
in his individual capacity,
ANTHONY FORTSON,
in his individual capacity,
DAMIEN MERCER,
in his individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(July 23, 2003)**

Before BIRCH and DUBINA, Circuit Judges, and KATZ*, District Judge.

_____

* Honorable Marvin Katz, United States District Judge for the Eastern District of Pennsylvania,
sitting by designation.

BIRCH, Circuit Judge:

In this appeal, we determine whether police officers are entitled to qualified immunity when an individual was shot in the course of surveillance. The district court accorded the officers qualified immunity. We affirm.

## I. BACKGROUND

In the early morning hours of Sunday, October 24, 1999, in Monroe, Georgia, defendants-appellees, Officers Joseph Tatangelo, Anthony Fortson, and Damien Mercer, were pursuing an individual who had fled during an investigatory stop that involved plaintiffs-appellants Romeo Carr and Cedrick Wymbs.[1] The

---

[1] This investigatory stop at approximately 1:30 A.M. at Jack Peters Grocery Store in Monroe, Georgia, was the subject of a prior 42 U.S.C. § 1983 case in which the district court accorded the officers qualified immunity for handcuffing Carr, Wymbs, and others to secure them while Officer Mercer chased the individual who ran from the scene. When Officer Mercer returned without the fleeing subject, the handcuffs were removed from Carr, Wymbs, and the others, and they were told that they were free to go. Carr v. Tatangelo, No. 3:00-CV-2 (DF), slip op. at 3-4 (M. D. Ga. Aug. 10, 2001) (order granting defendant police officers qualified immunity). Our court affirmed on the basis of the district court's opinion. Carr v. Tatangelo, No. 01-14698 (11th Cir. Apr. 26, 2002) (per curiam). Analyzing the former case under the Fourth Amendment, the district judge determined that the police officers reasonably believed that the car of individuals outside a previously robbed grocery store, located in a high-crime area, when the police believed that the store should have been closed, signaled reasonable suspicion that criminal conduct had occurred, was occurring, or was about to occur, which necessitated investigation. Carr, No. 3:00-CV-2(DF), slip op. at 12-13. The district judge concluded

> that it was reasonable to believe that Plaintiffs [Carr, Wymbs, and others] possessed weapons and that frisking them was necessary for safety purposes. First, Defendants [Officers Tatangelo, Fortson, and Mercer] generally knew that Plaintiffs had criminal records, and Officer Mercer specifically knew that Romeo Carr had been involved in an incident with a gun. Second, Defendants had legitimate cause to fear for their safety because they were outnumbered. Finally, Plaintiffs were in a high-crime area known for drug activity, and the Eleventh

2

officers decided to patrol the New Lacy Street area of Monroe, a high-crime area known for drug trafficking, to look for the individual who fled as well as to watch for drug activity.[2] While the officers were observing a pay telephone and the street for evidence of drug activity, visibly intoxicated Harold Henderson appeared, and Officer Mercer asked him what he was doing in the area at that time. Henderson, who said that he was going to get drugs for others at Carr's house, gave his name as Harold Wade and consented to a pat-down search. In Henderson's wallet, Officer Mercer found Henderson's parole identification card, which revealed that Henderson had given the officers an incorrect name and birth date. The officers also called into dispatch to see if Henderson had any outstanding warrants.

---

Circuit has recognized that individuals involved in drug trafficking are often armed. See United States v. Cruz, 909 F.2d 422, 424 (11th Cir. 1989) (per curiam). Under these circumstances, a limited protective search was reasonable.

Id. at 14. While the circumstances of this case are different, which affects our analysis, the interaction of the same police officers with Carr and Wymbs a short time thereafter is relevant knowledge for this case.

[2] Officer Tatangelo testified that, in addition to drug trafficking, this area had "shootings, aggravated assaults," and other crimes. Dep. of Joseph Tatangelo at 67. While the officers were on duty in those early morning hours, seventeen-year-old Chris Peters was riding with Officer Fortson in his patrol car as part of the police ride-along program. Peters accompanied the officers in their surveillance, which is the subject of this case, and was left to fend for himself when the shooting occurred.

To avoid going to jail, Henderson proposed a "deal" to the officers: in exchange for letting him go, Henderson volunteered to go to Carr's house and have somebody come out with drugs for the officers to arrest.[3] Dep. of Damien Mercer at 50-51. The officers agreed and let Henderson walk to Carr's house, although Officer Mercer kept his wallet. After Henderson had departed from the presence of the officers, they learned that there were three outstanding warrants for his arrest, including theft by taking and parole violation by escape. Dep. of Anthony Fortson at 288; Mercer Dep. at 58. At that point, the objective of the officers' surveillance changed, and they went to Carr's house to watch for Henderson to emerge so that they could apprehend and arrest him.[4] The officers never saw Henderson again.

The officers positioned themselves behind trees and bushes near Carr's house to give them a view of the house without being seen. Officer Tantagelo was across the street from Carr's house in an area where there were bushes and shrubs, Officer Fortson was on the same side of the street as Officer Tantagelo, but farther away from the house, and Officer Mercer was on the side of Carr's house lying on

---

[3] Officer Mercer described Henderson's proposed "deal" with the officers: "He said he would do us a favor if we would do him a favor." Dep. of Damien Mercer at 42.

[4] Officer Mercer explained that the officers did not knock on Carr's door to find Henderson because the warrants were not for Carr's address. Id. at 61.

the ground in some bushes. As the officers watched, a car with three or four women drove up in front of Carr's house, and the horn sounded. Carr went out to the car and conversed with the women from the passenger's side.

As Carr walked out to the vehicle and Wymbs walked outside and down the street to use the pay telephone, Henderson entered the house. As he returned from the pay telephone and walked toward Carr's house, Wymbs noticed movement in the bushes across the street, which he believed to be a person. When he reached the car where Carr was talking to the women, Wymbs asked Carr to come to the rear of the vehicle, told Carr of his concern, asked him to come and look with him, and threw a rock into the bushes where he had detected movement "[t]o see whether it was a real person." Dep. of Cedrick Wymbs at 95; Dep. of Romeo Carr at 71. After throwing his rock, Wymbs asked "[W]ho is that over there?" Wymbs Dep. at 100. He then called "Reggie, Reggie."[5] Carr Dep. at 72; Wymbs Dep. at 100, 157. Noticing no movement after Wymbs threw his rock and also thinking that the hidden individual might be Williams, Carr threw a rock hard and had his hand raised to throw another rock when he was shot.[6]

---

[5] Reggie Williams was the individual who had stabbed Carr's brother in an altercation the previous night. The brother was in a hospital in Atlanta, and Carr had visited him there earlier that evening.

[6] Carr testified that he believed that Williams might harm "somebody," either Carr "or anybody who would come out of our house." Carr Dep. at 72. He further testified: "If the police

5

Wymbs testified that, when he walked back from the pay telephone and threw rocks into the bushes, his sunglasses were on top of his head. Wymbs Dep. at 101-02. After throwing rocks, Wymbs "was folding [his sunglasses] up and putting them in [his] pocket," and Carr "was about to throw his [rock], [when the police officers] started shooting." Id. at 102. Carr has suggested that Wymbs's folding his sunglasses was the "click-clack noise" that the officers heard that caused them to start shooting. Id. at 122; Carr Dep. at 86. Carr testified that the noise of Wymbs's removing his glasses and placing them in his pocket cause him to think that Wymbs "had shot [Carr] at first." Carr Dep. at 86.

The police officers related the incident as they perceived it from their hidden locations. Officer Fortson testified that Officer Mercer communicated over the police radio that Carr and Wymbs knew that the officers were in the bushes. Fortson Dep. at 310. Carr and Wymbs walked across the street and were pointing and looking into the bushes. Officer Fortson testified that one asked: "[I]s that the 'po-po'?" Id. at 324, 335. The other responded: "[T]hat's not the 'po-po.'" Id. Immediately thereafter, Officer Fortson "heard someone racking a round,"[7] id. at

would have never said they shot me, I wouldn't even know today who it was." Id.

[7] In addition to his professional experience as a police officer, Officer Fortson had military experience that had taught him the distinctive sound of a bullet being chambered in a gun: "[e]ight years in the military, three years in the infantry, two years as a unit armorer taking care of the weapons, and a total of five years' law enforcement experience." Fortson Dep. at

6

344, 347, which caused him to draw his weapon, although he did not fire because there was no target; he waited until he "actually perceived a threat," id. at 357. Officer Tatangelo then screamed "'police,'" id. at 336, 361, whereupon Officer Fortson could see Carr and Wymbs pointing a weapon at Officer Tatangelo, id. at 358, 361. Officer Fortson verified: "I'm certain that one of them pointed a weapon at Officer Tatangelo."[8] Id. at 362. Officer Tatangelo testified that, when the gun was pointed at him, it "scared the hell out of me." Dep. of Joseph Tatangelo at 226. Then Officer Tatangelo "heard the rack of the gun [Carr or Wymbs] was holding," id. at 231, and he saw "what [he] believed to be a small portion of the barrel" of a semi-automatic weapon, id. at 232.[9]

Officer Fortson testified that he was the first to fire his weapon because Carr and Wymbs "pointed a weapon at Officer Tatangelo," Fortson Dep. at 364, and he "was protecting a third party," id. at 365. Officer Fortson fired only once because

---

349, 354. Although he did not see a gun at the time, id. at 354, he heard the unique sound of someone racking a gun: "It's kind of a combination between a click and a sliding sound," id. at 356.

[8] Officer Fortson testified: "I know one of the figures that was closest to where I was pointed a weapon by his silhouette." Fortson Dep. at 361-62.

[9] Similarly, Officer Mercer, who had "been around guns and hunting all [his] life" was "[a]bsolutely 100 percent positive" that he heard a gun racking. Mercer Dep. at 82. He further testified that he "was almost 100 percent sure that [Officers Tatangelo and Fortson] were working with their guns cocked and ready to fire" because most officers "carry a loaded weapon at work"; otherwise, "you might as well not have one." Id. at 87. He emphasized that "[p]olice officers don't rack guns before they shoot them." Id. at 92.

7

he saw the muzzle of Officer Tatangelo's gun, knew that he was moving toward Officer Fortson, and he did not want him to be in his line of fire. Following Officer Fortson's one shot, Officer Tatangelo testified that he fired his gun "eight" times and that he was shooting to kill. Tatangelo Dep. at 237. He believed that Carr had shot at him, and he shot so many times "[t]o eliminate the threat."[10] Id. at 243.

Like Officer Tatangelo, Officer Fortson testified that he believed that his life was in danger when he heard a bullet being chambered, that he "thought [Carr and Wymbs] were going to shoot Officer Tatangelo," Fortson Dep. at 368-69, and believed that, if they would "shoot him," then they would shoot Officer Fortson also, id. at 369. When Officer Fortson shot his gun, he aimed at center mass consistent with his training. Although Officer Fortson testified that "I'm the one who hit Romeo Carr," id. at 371, he also stated that, at the time, "I d[id]n't know whether I hit him or not," id. Moreover, Carr and Wymbs "took off running towards the house roughly almost instantaneously after the first shot." Id. at 374.

_____

[10] Officer Tatangelo explained the threat that he was trying to eliminate: "The threat was that he had a gun, he was pointing it at me, and I pulled my weapon to defend myself, my fellow officers, and the citizens of the city of Monroe. That's what I was doing. . . . It just happened so fast." Tatangelo Dep. at 245.

After Officers Tatangelo and Fortson ascertained that they were not wounded, and Officer Mercer ran across the street to join them, all the officers ran back to their cars following the shooting to await backup that they had summoned. Officer Fortson testified that they did not know "how far away backup was" and that they "didn't want to be in a hostile area," which did not "make good common sense." Id. at 394. Consequently, the officers ran back to their cars in a more secure area rather than pursuing Carr and Wymbs.[11] Frightened by his first experience of being close to gunfire in the line of duty, Officer Mercer radioed that shots had been fired, and, in addition to regular police backup, he "called for

_____

[11] Officer Fortson explained the reason for not pursuing Carr and Wymbs: "I wasn't going to chase somebody with a gun, not when they go into their own house." Fortson Dep. at 393. He also explained the officers' reasoning for leaving an unsecured area and running to their cars in a secure area to wait for backup:

> [W]e were in basically a very unsecured area, we needed to get back to an area where we were secured, we were safe, and we could get backup to come in there without them being compromised.
> . . . .
> An unsecured area is an area that we don't have control over. I had no control over that street whatsoever. By me standing there doesn't mean I had control over it. I could not control if somebody were to come out with an AK-47 and waste all of us. I couldn't control that.
> Back at our cars, back at our patrol cars, we had a little bit more control of the area as far as we knew that no one was going to walk out the door with a weapon, or we had a safe assumption that nobody was going to walk out their door with a weapon.

Id. at 401-02.

9

the National Guard," Mercer Dep. at 90, and a helicopter to search the woods with light, id. at 96. No gun that Carr or Wymbs may have had was located outside or inside Carr's house, and they denied having a gun.[12]

When the shooting began, Carr "took off running" and did not realize that he had been shot until he was inside his house.[13] Carr Dep. at 76. Moreover, Carr outran Wymbs, who had not been shot, was the first back at his house, and dove in the front door. Id. at 77. He lay on the floor in the front hallway until the paramedics arrived.

After the shooting stopped, approximately twenty people came out into the street, and they were angry about the shooting. Wymbs and Carr's brother ran outside, stopped a county police car that was driving by, and informed that Carr had been shot. The county police called for backup and an ambulance. Wymbs testified that, from the end of the shooting until the county police were notified, was "less than five minutes." Wymbs Dep. at 120. The Monroe City Police arrived in "less than two minutes" and secured the scene. Id. at 121. Then, the ambulance arrived and took Carr to the hospital for medical assistance.

_____

[12] Wymbs testified that neither he nor Carr had a gun when they were throwing rocks at the figure in the bushes. Wymbs Dep. at 106.

[13] When asked if he felt the bullet that hit him, Carr responded: "No. When I got in the house, my stomach felt like something swelling up. I pulled my shirt up and looked. My stomach had a hole in it." Carr Dep. at 76.

Carr and Wymbs filed a 42 U.S.C. § 1983 action in the Middle District of Georgia against Officers Tatangelo, Fortson, and Mercer and alleged denial of Fourteenth Amendment rights of substantive due process as to Carr and Wymbs with respect to excessive force and medical care as to Carr as well as various state claims. They also sought punitive damages and attorneys' fees under 42 U.S.C. § 1988. Determining that Carr and Wymbs failed to show the alleged constitutional violations on the facts of this case, the district judge, following a hearing, granted the officers' summary judgment motions on the basis of qualified immunity and declined to exercise supplemental jurisdiction over the state-law claims. On appeal, Carr and Wymbs pursue their arguments under the Fourth and Fourteenth Amendments.

## II. DISCUSSION

We review a district court's granting summary judgment based on qualified immunity de novo. Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In our summary-judgment review, "we construe the facts and draw all reasonable inferences in the

11

light most favorable to the nonmoving party." Farrow v. West, 320 F.3d 1235, 1239 n.2 (11th Cir. 2003) (emphasis added).

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[14]   Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  This defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).  "[Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" Hope v. Pelzer, 536 U.S. 730, __, 122 S.Ct. 2508, 2515 (2002) (quoting Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 2158 (2001)).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." Id. at __, 122 S.Ct. at 2513.  Even "constitutionally impermissible conduct" might not render government officials liable for civil damages if those

---

[14] There is no question in this case that Officers Tatangelo, Fortson, and Mercer were acting in their discretionary capacities as police officers when the challenged shooting occurred.

12

actions had not been clearly established as violative of the Constitution when they occurred. Id. at __, 122 S.Ct. at 2515.

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987)) (internal citation omitted). Accordingly, if the issues that Carr and Wymbs have raised on appeal establish a constitutional violation, then we must determine if Officers Tatangelo, Fortson, and Mercer violated the constitutional rights of appellants and, if so, whether they had "fair warning" under clearly established law that their conduct was unconstitutional. Id.

A. Excessive Force

Carr and Wymbs contend that Officers Tatangelo and Fortson's shooting at them constituted excessive force. Because the participation of each was different, their arguments involve separate constitutional analyses. Fourth Amendment analysis applies to Carr, since he was shot.[15] In contrast, Fourteenth Amendment,

---

[15] Although Carr maintained his excessive-force claim as to his being shot under the Fourteenth Amendment in district court, the Supreme Court has clarified

> that all claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop,

13

substantive-due-process analysis applies to Wymbs because he was not impacted physically in the shooting.

1. <u>Romeo Carr</u>

"Violation of the Fourth Amendment requires an <u>intentional</u> acquisition of physical control." <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381 (1989) (emphasis added). Fourth Amendment analysis of intentional physical control by police officers in § 1983 cases alleging excessive force, "[a]s in other Fourth Amendment contexts," is subject to an objective reasonableness inquiry: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

<hr>

or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

<u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989). The district judge accorded the police officers qualified immunity as to Carr's excessive-force claim relating to his being shot because he litigated this issue under Fourteenth Amendment, substantive due process, rather than the Fourth Amendment. Consequently, the district judge did not analyze Carr's excessive force claim under the Fourth Amendment. On appeal, however, Carr pursues this argument under the Fourth Amendment only. Because the Fourth Amendment is the proper basis for this claim, we analyze it under the Fourth Amendment. "[W]e may affirm the district court as long as 'the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court.'" <u>Ochran v. United States</u>, 273 F.3d 1315, 1318 (11th Cir. 2001) (citation omitted).

14

underlying intent or motivation."[16]  Graham v. Connor, 490 U.S. 386, 397, 109

S.Ct. 1865, 1872 (1989); see Tennessee v. Garner, 471 U.S. 1, 9, 105 S.Ct. 1694,

1700 (1985) (noting that the constitutional justification of a particular seizure is

determined by "the totality of circumstances").

> The "reasonableness" of a particular use of force must be
> judged from the perspective of a reasonable officer on the scene,
> rather than with the 20/20 vision of hindsight. . . .  The calculus of
> reasonableness must embody allowance for the fact that police
> officers are often forced to make split-second judgments–in
> circumstances that are tense, uncertain, and rapidly evolving–about
> the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872.[17]

An intentional seizure of a person "readily bears the meaning of a laying on

of hands or application of physical force to restrain movement, even when it is

ultimately unsuccessful."  California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct.

1547, 1550 (1991).  "While it is not always clear just when minimal police

interference becomes a seizure, there can be no question that apprehension by the

---

[16] To the extent that Carr has suggested that the officers bore ill will toward Carr and Wymbs from their encounter with them earlier that night, not only is there no evidence that was the case, but also subjective intent is inappropriate in qualified immunity, objective reasonableness analysis.

[17] Carr and Wymbs have taken issue with the district court for considering the officers' responses and reactions to their respective perceptions that Carr or Wymbs was pointing a gun and chambering a bullet at Officer Tatangelo.  Yet, Graham requires an evaluation of the officers' reasonable apprehension to assess their responses to the circumstances confronting them, particularly in  rapidly evolving situation.

15

use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 7, 105 S.Ct. at 1699 (internal citation omitted). The Supreme Court has instructed that determination of the constitutionality of a seizure requires "'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Id. at 8, 105 S.Ct. at 1699 (citation omitted). Relevant to this case, the Court has recognized that it is constitutionally permissible for an officer to use deadly force when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. at 11, 105 S.Ct. at 1701; Willingham v. Loughnan, 261 F.3d 1178, 1186 (11th Cir. 2001).

Carr has argued that a seizure did not occur under the Fourth Amendment because he was not stopped but ran back to his house. The seizure occurred when Carr was struck by the bullet from Officer Fortson's gun; in running away he submitted by retreating, although he was not stopped until he until he reached his house.[18] Because Officer Fortson's shot to Carr's abdomen was not fatal and

---

[18] We have recognized that delay following an officer's shooting an individual and the intended result does not negate Fourth Amendment seizure: "It is also apparent that [a § 1983 plaintiff] could have been 'seized' for Fourth Amendment purposes even though he was not taken into custody immediately following the shooting. . . . Undeniably, [the officer's] firing of his weapon was an application of force with the design to restrain movement." Vaughan v. Cox, 264 F.3d 1027, 1033 (11th Cir. 2001), cert. granted, opinion vacated, and remanded, 536 U.S.

16

because of his fright and apparent adrenaline rush in the exigencies of the moment, Carr was able to run across the street to his house to seek refuge. Officer Fortson had shot to kill to save the life of Officer Tatangelo, and it is his intent and the physical contact of the bullet from his gun that governs our Fourth Amendment, seizure analysis. Although Carr was not immediately stopped by the bullet from Officer Fortson's gun, he nevertheless was seized within the meaning of the Fourth Amendment when the bullet struck or contacted him. See Vaughan v. Cox, 264 F.3d 1027, 1033 (11th Cir. 2001) ("Because [§ 1983 plaintiff] was hit by a bullet that was meant to stop him, he was subject to a Fourth Amendment seizure."), cert. granted, opinion vacated, and remanded, 536 U.S. 953, 122 S.Ct. 2653 (2002), opinion reinstated, 316 F.3d 1210, 1214 (11th Cir.), cert. denied, ___ U.S. ___, 123 S.Ct. 2252 (2003); Menuel v. City of Atlanta, 25 F.3d 990, 996 (11th Cir. 1994) ("In sum, the officers seized the decedent by shooting her, but . . . violated none of her Fourth Amendment rights as a result.").

Having determined that Carr has stated a cognizable Fourth Amendment seizure claim, we must decide if the officers violated clearly established law in shooting him. "An officer is entitled to qualified immunity if a reasonable officer,

---

953, 122 S.Ct. 2653 (2002), opinion reinstated, 316 F.3d 1210, 1214 (11th Cir.), cert. denied, ___ U.S. ___, 123 S.Ct. 2252 (2003).

17

under the circumstances, might have thought that the use of force did not violate the federal law at the time of the incident." Willingham, 261 F.3d at 1187. Although he had drawn his weapon, Officer Fortson did not fire his gun until he saw Carr point what he perceived to be a gun into the bushes behind which Officer Tatangelo was hiding and heard the sound of a bullet being chambered. Both he and Officer Tatangelo testified that they heard this distinctive sound.[19]

Officer Fortson testified that he shot Carr with the intention of killing him, as he had been trained, in order to prevent Carr from shooting Officer Tatangelo. In a split-second, rapidly escalating situation involving perceived deadly force, coupled with his police response training, Officer Fortson acted in an objectively reasonable manner to the perceived imminent threat to his fellow officer to save his life. Officer Tatangelo's subsequent shooting of bullets that did not strike Carr or Wymbs was reaction to the same perceived threat of a gun and the chambering of bullets to protect himself. We have "acknowledged[d] that law enforcement officers . . . may reasonably but mistakenly conclude that probable cause exists to

---

[19] The officers also knew that they were in a high-crime neighborhood. See supra note 1.

18

justify the use of deadly force."[20] <u>Vaughan v. Cox</u>, 316 F.3d 1210, 1214 (11th

---

[20] Acknowledging <u>Garner</u> as "[t]he clearly established standard" in a similar case that occurred in 1992, the Fourth Circuit explained "that a police officer's use of deadly force is not excessive where he has probable cause to believe a suspect poses a threat of serious physical harm to the officer or others." <u>McLenagan v. Karnes</u>, 27 F.3d 1002, 1006-07 (4th Cir. 1994). "Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the subject officer] <u>could</u> have, in light of <u>Garner</u>, believed that his conduct was lawful, then [the officer] is entitled to qualified immunity." <u>Id.</u> at 1007.

In <u>McLenagan</u>, the defendant police officer heard another police officer yell, "The man has got a gun!" <u>Id.</u> at 1005. The officer immediately drew his gun, turned around, and saw the suspect almost upon him. <u>Id.</u> Although the officer could not see whether the suspect had a gun, he shot him anyway. <u>Id.</u> As the suspect fell to the ground with "serious injuries to his hands and abdomen," the officer saw that he had no weapon. <u>Id.</u>

The Fourth Circuit determined that this use of force was reasonable under the circumstances and that a warning was unnecessary in the particular situation. <u>Id.</u> at 1007-08.

> For all [the officer] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. <u>We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life.</u>
> . . . It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed. <u>We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others.</u> Although it is extremely unfortunate that [the suspect] was seriously injured, § <u>1983 does not purport to redress injuries resulting from reasonable mistakes.</u>
> . . . [I]n <u>this</u> case, [the officer] had no time to consider anything at all—except his and the public's immediate safety. At the moment of truth, [the officer] acted well within the range of behavior expected of a police officer. What happened after the critical time had passed is simply irrelevant.

<u>Id.</u> (first, second, and third emphases added). We agree with the reasoning of the Fourth Circuit in <u>McLenagan</u>, which is analogous to the shooting incident in this case. This reasoning is particularly relevant to Carr and Wymbs's contentions that the officers should have warned or identified themselves, a fact that is in contention.

19

Cir.), cert. denied, __ U.S. __, 123 S.Ct. 2252 (2003).

When Carr was shot in 1999, Garner, permitting an officer to use deadly force to protect himself or others, had been Supreme Court law for fourteen years.[21] As we have noted previously when a seizure by shooting occurred in a rapidly escalating situation that resulted in death: "'Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.'" Menuel, 25 F.3d at 997 (citation omitted). In determining whether the officers in this case are entitled to qualified immunity, we analyze the precise circumstances immediately preceding Carr's being shot and not the earlier surveillance decisions or the events following the shooting. Under the Fourth Amendment objective reasonableness standard applied to the officers'

---

[21] Carr's arguments that the officers were not chasing him as a fleeing felon or attempting to arrest him and take him into custody are inapposite. At the time when the shooting occurred, the appropriate analysis under Garner was defense of self and others. Based on Garner, the Fifth Circuit accorded qualified immunity to officers when an individual who was riding in a car during a high-speed chase by officers following a robbery was shot and killed. Reese v. Anderson, 926 F.2d 494 (5th Cir. 1991). After the getaway car spun out of control and stopped, a police officer ordered the occupants inside the car to raise their hands. When one occupant raised and lowered his hands several times, an officer, believing that the man was reaching for a gun that would place the officers in danger, shot him once in the head at a distance of approximately ten feet and killed him. Although the parties differed on how the shooting transpired, the Fifth Circuit determined that the shooting "was reasonable and not excessive." Id. at 500. Reversing the denial of summary judgment based on qualified immunity to the individual officers, the court explained that "[u]nder these circumstances, a reasonable officer could well fear for his safety and that of others nearby." Id. at 501.

20

defense of themselves and a fellow officer, Officers Fortson, Tatangelo, and

Mercer[22] are entitled to qualified immunity on Carr's Fourth Amendment, seizure

argument.[23]

2. Cedrick Wymbs

Because Wymbs was not shot or physically touched by the officers, his

excessive force cause of action relating to the shooting is based on substantive due

process under the Fourteenth Amendment. We have held "that a non-seizure

Fourteenth Amendment substantive due process claim of excessive force survives

Graham." Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir. 1993); see County of

Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715 (1998) ("The

Fourth Amendment covers only 'searches and seizures,' neither of which took

place here."). "[T]he substantive due process guarantee protects against

---

[22] The apparent cause of action against Officer Mercer was his failure to intervene to prevent the shooting. Officer Mercer, however, was across the street lying under bushes beside Carr's house, his surveillance position. While he was in radio contact with Officers Tatangelo and Fortson, his view was of Carr and Wymbs's backs, so he was not in a position to see whether or not they possessed a weapon. He did not participate in the shooting; indeed, he was unaware of the rapidly developing situation until he heard the racking of a gun immediately preceding the shooting, which gave him no time to act from across the street. Consequently, under the objective reasonableness standard that we must apply, Officer Mercer is entitled to qualified immunity.

[23] Although the parties have not provided, and we have not located, a case with precisely these circumstances, the pre-existing Supreme Court decisions in Garner as well as Graham and Brower clearly established that Officers Tatangelo, Fortson, and Mercer acted in an objectively reasonable manner in this situation. Hope, 536 U.S. at __, 122 S.Ct. at 2515.

21

government power arbitrarily and oppressively exercised." Lewis, 523 U.S. at 846, 118 S.Ct. at 1716 (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 664 (1986)). The Supreme Court has explained that "the cognizable level of executive abuse of power [i]s that which shocks the conscience." Id. at 846, 118 S.Ct. at 1717 (referencing Rochin v. California, 342 U.S. 165, 172-73, 72 S.Ct. 205, 209-10 (1952)).[24] "[O]nly the most egregious official conduct" will be the sort of "abusive executive action" that can be sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim. Id. at 846, 118 S.Ct. at 1716. The Court viewed "conduct intended to injure in some way unjustifiable by any government interest [a]s the sort of official action most likely to rise to the conscience-shocking level." Id. at 849, 118 S.Ct. at 1718 (emphasis added). The Court also instructed that "our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of

---

[24] The shocks-the-conscious standard means that the conduct must "do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically"; it must "offend even hardened sensibilities." Rochin, 342 U.S. at 172, 72 S.Ct. at 209, 210; see Gilmore v. City of Atlanta, Ga., 774 F.2d 1495, 1500 (11th Cir. 1985) (en banc) (recognizing that "the violations which give rise to a substantive due process claim are necessarily more egregious than those which give rise to simple tort actions").

circumstances before any abuse of power is condemned as conscience shocking."[25]

Id. at 850, 118 S.Ct. at 1718-19.

We have delineated for our circuit the justifiable government interests to be evaluated when assessing the applicability of qualified immunity to a claim of excessive force for a substantive due process violation by police officers:

Similar to the standard used to evaluate Fourth Amendment excessive force claims, the standard used to evaluate substantive due process excessive force claims looks to a number of factors, including "the need for force and the amount of force used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Again, similar to the standard used to evaluate Fourth Amendment excessive force claims, this standard does not establish a "bright line" that would readily alert officers to a violation. Therefore, "qualified immunity applies unless the application of the standard would inevitably lead every reasonable [official] in [the officer's] place to conclude the force was unlawful."

---

[25] Aligning procedural due process with substantive due process as to consideration of totality of the circumstances, the Court further explained:

"The phrase [due process of law] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial."

Lewis, 523 U.S. at 850, 118 S.Ct. at 1719 (quoting Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256 (1942)).

23

Jones v. City of Dothan, Ala., 121 F.3d 1456, 1461 (11ᵗʰ Cir. 1997) (per curiam) (alterations in original) (citations omitted). Consequently, Wymbs had a higher burden to show a violation of substantive due process under the Fourteenth Amendment than did Carr in demonstrating a Fourth Amendment violation. We initially must review the circumstances of the shooting as to Wymbs to determine whether he has stated a constitutional violation by the officers in this case. If not, then the officers are entitled to qualified immunity. Hope, 536 U.S. at __, 122 S.Ct. at 2513.

We first examine the need for force and the amount of force used. In those dark, early Sunday morning hours, Officers Tantangelo, Fortson, and Mercer were conducting surveillance in a high-crime neighborhood. They were hidden and watching for Henderson, with outstanding warrants, to emerge from Carr's house so that they could arrest him, which was characteristic police work. While Officers Tatangelo and Fortson were hidden by bushes across the street from Carr's house, Carr and Wymbs began to throw rocks into the bushes behind which they were hidden. They then walked in front of the bushes behind which Officer Tatangelo was hidden, and both officers believed that they saw either Carr or Wymbs point a gun at Officer Tatangelo. Whatever doubt as to their perception of a gun was eliminated when both officers heard a click-clack sound, a noise each

24

officer independently identified from his training and experience with weapons as the distinctive sound of a bullet being chambered in a gun. Although Carr now claims that the click-clack sound was Wymbs folding his sunglasses, significantly, he testified that he thought Wymbs had shot him, which indicates that Carr thought that Wymbs had a gun.[26] Thus, three people at the scene of the shooting

---

[26] We note, as did defense counsel at the summary judgment hearing, that it is unusual for someone to be wearing sunglasses in such early morning hours when it is dark. R2-11. Regarding whether Carr and Wymbs had a gun when they thought that Williams, who had stabbed Carr's brother, was in the bushes, the district judge had an insightful exchange with defense counsel at the summary judgment hearing:

> THE COURT: But, I mean, it doesn't really add up. You're afraid that Reggie Williams is out there, he has already stabbed your brother, you're a little afraid—you are afraid of him. Are you going to make him even madder by throwing rocks at him?
>
> [DEFENSE COUNSEL]: Your honor, I completely agree with the preposterousness of that position, which is exactly why I kind of label this you-don't-bring-a-rock-to-a-gun fight, and which also makes it . . . a lot less likely that these plaintiffs, who believe that this guy has stabbed one of their brothers is in the bushes, that they're lobbing rocks rather than pointing a gun and make[s] their story a lot less plausible.

Id. at 19. Additionally, the fact that a gun was not located outside or inside Carr's house is not determinative. Defense counsel gave a reasonable explanation of how the gun could have disappeared:

> [I]t is important to note that there were numerous people inside the Carr residence. Cedric[k] Wymbs and Romeo Carr both fled directly into the residence after the shooting.
> There were numerous people in there at that time, and those people, one of those persons could have easily taken the gun and gone out the back of the house before any other officers came up because our officers went . . . back to their car to get help.
> In fact, Harold Henderson, who had gone into the Carr

25

believed that Carr or Wymbs had a gun, including Officers Tatangelo and Fortson who testified that they saw the gun from behind the bushes. When both Officers Tatangelo and Fortson reasonably perceived that deadly force had been drawn on Officer Tatangelo, their surveillance ended, and they were entitled to respond in kind with deadly force to protect themselves. The amount of force with which they responded was directly proportional to that with which they were confronted.

The second factor we consider is the extent of the injury caused by the police conduct. Wymbs incurred no physical injury as a result of the shooting incident. The third factor requires us to determine whether force was used in good faith to maintain or restore order or maliciously and sadistically to cause harm. At the summary judgment hearing, counsel for Carr and Wymbs conceded that he would characterize the officers' conduct as "malicious" and not sadistic. R2-35. The alleged malicious conduct consisted of the use of Henderson as an informant that caused the officers to be hiding outside Carr's house.[27] The officers' earlier

> residence, was not there when the other officers came to assist Mr. Carr with his injury. So at least one person who had been in the house was not there afterwards.

Id. at 15-16.

[27] Carr and Wymbs have faulted the district court for not considering a preliminary report by expert witness Lou Reiter in opposition to Officer Tatangelo's motion for summary judgment. This preliminary report purports to show that the police practices used by these officers were inconsistent with accepted police practices. The preliminary report, however, is not based on personal knowledge of this case and does not take into account the sworn testimony of the

dealings with Henderson, however, do not bear on whether it was reasonable for them to commence shooting when they perceived that Carr or Wymbs had pointed a gun at Officer Tantangelo and chambered a bullet. The shooting was not malice; it was self-defense and defense of a fellow officer. Significantly, neither officer fired his weapon until life-threatening danger was imminent, signaled by chambering of a bullet.

The protective shooting by Officers Fortson and Tatangelo does not rise to the level of egregious conduct that would shock the conscience of a person even with the most tender sensibilities. After assessing the requisite factors in the totality of the circumstances of this case, we conclude that Wymbs has not stated a

---

officers involved. Importantly, the alleged expert's report is unsworn. Only "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" can be considered by the district court in reviewing a summary judgment motion. Fed. R. Civ. P. 56(c) (emphasis added). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters related therein." Fed. R. Civ. P. 56(e). Unsworn statements "do[] not meet the requirements of Fed. Rule Civ. Proc. 56(e)" and cannot be considered by a district court in ruling on a summary judgment motion. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n.17, 90 S.Ct. 1598, 1608-09 n.17 (1970). Because the preliminary report was submitted without attestation, it had no probative value and properly was not considered by the district judge in ruling on the officers' summary judgment motions.

Carr and Wymbs also have complained that the account of Chris Peters, the teenager who accompanied Officer Fortson on the night of the shooting, was not considered in deciding the summary judgment motions. Peters was hiding behind a tree too far away from the shooting to have given helpful information because he was not in a position to see the gun. Whether or not Peters heard a gun being chambered is irrelevant; our analysis on qualified immunity review concerns only what the police officers perceived to determine if they acted reasonably in this situation.

27

violation of substantive due process as to the shooting incident in which he was involved. Hope, U.S. at __, 122 S.Ct. at 2513. Therefore, Officers Tatangelo, Fortson, and Mercer[28] are entitled to qualified immunity on Wymbs's substantive due process claim. Jones, 121 F.3d at 1461.

## B. Denial of Medical Care

Carr contends that Officers Tatangelo, Fortson, and Mercer denied his Fourteenth Amendment substantive due process rights by failing to provide him medical assistance after he was shot. To determine if the officers are entitled to qualified immunity on this claim, we must decide whether Carr's allegation has stated a constitutional violation. Hope, 536 U.S. at __, 122 S.Ct. at 2513. If Carr has not stated an established constitutional right, then the district judge appropriately accorded the officers qualified immunity.

---

[28] Inasmuch as Officers Fortson and Tatangelo are entitled to qualified immunity for Wymbs's substantive due process claim for their action of defensive shooting, Officer Mercer is entitled to qualified immunity for his inaction under the circumstances. Officer Mercer was positioned across the street to the side of the Carr house when the shooting occurred. He never drew his weapon, fired his weapon, or spoke to Carr or Wymbs. Moreover, at the relevant time, Wymbs was not even aware that Officer Mercer was present. Wymbs Dep. at 105. From across the street, Officer Mercer could not see the rapidly escalating surveillance situation. It is not credible even to postulate that he had a reasonable opportunity to prevent the shooting. See Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996) ("Because [the government official] had no reason to expect the use of excessive force until after it occurred, he had no reasonable opportunity to protect [the arrestee], and the obligation to take steps to protect him never arose.").

Carr bases his constitutional right to medical assistance from the officers who injured him on the Supreme Court's recognition that the Fourteenth Amendment substantive due process clause "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 2983 (1983). He augments this constitutional right with our circuit law providing that "[d]eliberate indifference to serious medical needs may be shown by failure to provide prompt attention to those needs by delaying necessary medical treatment for nonmedical reasons." Thomas v. Town of Davie, 847 F.2d 771, 772-73 (11th Cir. 1988). These cases are inapposite to Carr's situation.

City of Revere concerns individuals being apprehended by police officers to be taken into custody. The Supreme Court also has recognized "that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005 (1989). Thus, the Court has noted a general constitutional right to medical care under the cruel and unusual punishment clause of the Eighth Amendment for convicted prisoners and

under the substantive due process clause for pre-trial detainees under the Fourteenth Amendment.  Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).  The Court additionally has recognized a substantive due process right to medical care for persons whose liberty has been restrained by confinement in a mental institution, incarceration, or arrest and concluded that "[t]he 'process' that the Constitution guarantees in connection with any deprivation of liberty thus includes a continuing obligation to satisfy certain minimal custodial standards."  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 127-28, 112 S.Ct. 1061, 1070 (1992).  Carr, however, was not apprehended, being apprehended, or otherwise being taken into custody by Officers Fortson and Tatangelo when he was shot.  None of these cases relating to provision of medical assistance where one's liberty has been restrained are applicable to Carr's situation.

Implicit in our Thomas decision concerning deliberate indifference to serious medical needs is knowledge that the medical need exists.  It is clear from the record in this case that the police officers did not know that Carr was injured when he ran back across the street into his house.  Carr even outran Wymbs and was able to dive in his front door.  Indeed, Carr did not know that he had been shot until after he was inside his house.  If Carr had fallen bleeding in front of Officers

30

Tatangelo and Fortson after he was shot, then they would have been aware that he had medical needs that required attention. On the facts of this case, however, the officers did not discover that Carr had been shot until after he had been taken from the scene by ambulance to a hospital for the medical care that he needed.[29] We have not located any case that would require police officers potentially to endanger their lives by entering hostile territory involving gunfire to check to see if perpetrators who ran from the scene, visibly unharmed, were in need of medical assistance. We will not create such a requirement in this case,[30] which, for qualified immunity, would not be applicable to the officers when the shooting in question occurred. Because Carr has not a stated cognizable constitutional claim on the facts of this case relating to denial of medical assistance, Officers Tatangelo, Fortson, and Mercer are entitled to qualified immunity.

---

[29] We also note that the arrival of the ambulance and Carr's transportation to the hospital were expeditious. Given the brief time before Carr received the medical attention that he needed, albeit with the assistance of other authorities, it does not appear that he could have been given more prompt medical care, which essentially negates this aspect his substantive due process claim.

[30] The Supreme Court has admonished that judicial restraint "requires us to exercise the utmost care whenever we are asked to break new ground in" substantive due process law: "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins, 503 U.S. at 125, 112 S.Ct. at 1068.

## III. CONCLUSION

Carr and Wymbs have appealed the district court's granting qualified immunity to the police officers involved in the challenged shooting incident based on claims of excessive force under both the Fourth and Fourteenth Amendments and denial of medical assistance under the Fourteenth Amendment. While the officers may not have exhibited paradigmatic police work in the course of the night and early morning hours in question, Carr and Wymbs have failed to state constitutional violations or show that the officers' conduct was unreasonable under clearly established law on the objective facts of this case that would render the officers liable for damages. Accordingly, the district court's granting summary judgment based on qualified immunity to Officers Tatangelo, Fortson, and Mercer is AFFIRMED.