[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-11679
Non-Argument Calendar

_____

D. C. Docket No. 03-00087-CV-ORL-28-DAB

NEAL EVERETT NICARRY,

Plaintiff-Counter-Defendant-Appellant,

versus

MICHAEL CANNADAY,
individually and in his official capacity
as a Deputy Sheriff of Seminole County,
DONALD ESLINGER,
in his official capacity as
Sheriff of Seminole County, Florida,

Defendants-Counter-Claimants-Appellees,

LAWRENCE PIERRE SMITH,
individually and in his official capacity as
a Trooper of the Florida Highway Patrol, et al.,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(December 19, 2007)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Neal Everett Nicarry, a Florida prisoner proceeding pro se, appeals the

district court's order granting summary judgment to defendants Deputy Michael

Cannaday and Sheriff Donald Eslinger on Nicarry's 42 U.S.C. § 1983 claims of

use of excessive force and failure to properly train and supervise. After review, we

affirm.[1]

## I. BACKGROUND

This action arose out of an attempt by defendant Cannaday to stop the van

plaintiff Nicarry was driving and the resulting foot pursuit when Nicarry

abandoned the van and fled. At approximately 10:45 p.m. on November 20, 1998,

plaintiff Nicarry was driving his brother's van in a residential neighborhood while

drinking a beer. Nicarry had been drinking and smoking crack cocaine earlier in

_____

[1]We review de novo a district court's grant of summary judgment based on qualified immunity, viewing all evidence and reasonable inferences in a light most favorable to the non-moving party. Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2001). While many of the facts are disputed, we outline the version of the facts most favorable to Nicarry.

2

the day and was "coming down." Also, Nicarry's driver's license was suspended.

Seminole County Deputy Cannaday observed Nicarry run a stop sign and turned on his patrol car's overhead lights to effect a traffic stop of Nicarry's van. Nicarry did not pull over. Instead, Nicarry sped up because of his suspended license and the open container of alcohol in the van.

Nicarry drove the van onto two highways before turning into a residential neighborhood. Nicarry drove in the residential area and then abandoned the van and fled on foot in hopes of evading police. By this time two patrol cars and a helicopter pursued him.

Nicarry ran into a residential backyard and jumped over several fences. Cannaday pursued Nicarry on foot, yelling at Nicarry to stop. Several other patrol units, including a canine unit, arrived and began to search for Nicarry.

Approximately thirty minutes into the foot chase, Nicarry found a shed in a small backyard with a swimming pool. Nicarry decided to hide in the shed, which had a single door that opened out into the yard and had a window on its right side. The shed's door was held shut with an eight-inch screwdriver. Inside the shed was a lawnmower. After Nicarry entered the shed, he kept the screwdriver in his hand and lay down on the floor.

Nicarry was in the shed for approximately twenty to thirty minutes when

3

Trooper Lawrence Smith walked past the shed and shined a light in the window. When Smith first entered the yard, the homeowner told Smith that he fastened the shed door with a screwdriver. Smith looked through the shed window, saw Nicarry crouched inside and ordered him to come out. Smith opened the shed door, backed up several steps facing the door, but slightly to the right, approximately ten feet from the door and drew his gun. Smith shined his flashlight into the shed and again commanded Nicarry to come out.

By this time other law enforcement officers were joining Smith around the shed, including defendant Cannaday, who also drew his gun. There are slightly differing accounts as to precisely where Cannaday was standing in relation to Smith and the shed. However, no one disputes that Cannaday was one of the five officers clustered roughly in a half circle around the shed door when Smith ordered Nicarry to come out.[2]

Five or ten seconds after Smith again commanded Nicarry to come out of the shed, Nicarry grabbed the screwdriver in his right hand, rose up, stepped on top of

---

[2]Although Nicarry believed from the location of his gunshot wound that Cannaday must have been positioned to Nicarry's right and somewhat behind him, Nicarry admitted that he could not see the officers as he exited the shed because a flashlight was shining in his face and he had no independent knowledge of where any of the officers were standing. No other witness placed Cannaday behind Nicarry as Nicarry exited the shed. Cannaday testified that he positioned himself to the left of Smith almost in front of the shed door.

the lawnmower and leaped out of the shed.[3]  Nicarry is a large man, weighing approximately 240 pounds and standing six feet, three inches tall.  Nicarry burst out of the shed, running as fast as he could straight ahead, with the screwdriver still in his hand.[4]

As Nicarry ran out of the shed, Cannaday saw that Nicarry had an object in his hand and heard someone say "drop the screwdriver."[5]  Nicarry was fairly close to Cannaday and Smith, both of whom believed Nicarry might stab them.  All five officers present at the scene, including Cannaday, perceived Nicarry's actions as threatening and feared for either their safety or the safety of other officers.

Smith and Cannaday fired their gun three times each.  Nicarry was shot in the right side of his back and fell approximately eleven feet from the shed door.  Two other bullets grazed Nicarry's head and leg.  Nicarry was within only a few feet of the officers when he fell.

---

[3]Nicarry claims that he grabbed the screwdriver because he thought that, if he left it in the shed, police would be able to identify him through fingerprints on it.

[4]Several of the officers, including Cannaday and Smith, testified that when Nicarry charged out of the shed, he was yelling or growling as if he was in "attack mode" and was holding the screwdriver above his head.  Nicarry testified that he did not remember yelling or growling or having the screwdriver raised above his head as he ran.  Nicarry did not remember where he held the screwdriver as he exited the shed, but conceded that the screwdriver was in plain sight.  For purposes of our review, we assume Nicarry was not yelling and was holding the screwdriver in plain sight.

[5]In earlier statements, Cannaday identified the speaker as Smith.  Smith, however, testified that he did not announce that Nicarry had anything in his hand.  When informed of Smith's testimony, Cannaday responded that he remembered hearing "drop the screwdriver."

After the shooting, an investigator with the Florida Department of Law Enforcement ("FDLE") found three .40 caliber casings and three 9 millimeter casings at the scene. Further, an FDLE investigator examined the shirt Nicarry wore when he was shot and found "3 in-line holes in the middle of the back" that were consistent with the entrance of a single projectile. The bullet lodged in Nicarry's hip was later determined to have been fired by Cannaday.

Nicarry filed a § 1983 complaint alleging, inter alia, that Cannaday used excessive force when he shot Nicarry and that Sheriff Eslinger failed to properly train Cannaday on the use of force. The district court granted summary judgment on qualified immunity grounds. Specifically, the district court granted summary judgment to Cannaday on the excessive force claim, concluding that Cannaday's use of force under the circumstances was objectively reasonable. The district court further found that, because Cannaday did not violate Nicarry's constitutional rights, Nicarry's failure-to-train claim against Eslinger necessarily failed as well. Nicarry filed this appeal.[6]

## II. DISCUSSION

---

[6]The district court dismissed all claims against two co-defendants, Florida Highway Patrol Trooper Lawrence Pierre Smith and the Florida Department of Highway Safety and Motor Vehicles, and Nicarry does not appeal their dismissal. Likewise, the district court entered summary judgment on Nicarry's state tort claims of negligence and battery against all four defendants, including Cannaday and Eslinger, and Nicarry does not challenge those rulings on appeal.

On appeal, Nicarry asserts that a jury could have concluded from the facts presented that Cannaday's use of force was not objectively reasonable and thus, Cannaday was not entitled to summary judgment on qualified immunity grounds. In determining whether an individual defendant is entitled to qualified immunity, we must first determine whether, taking the facts in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). If a constitutional violation is shown, we then consider whether the constitutional right was clearly established. Id.[7]

The Fourth Amendment right to be free from unreasonable seizures includes the right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quotation marks omitted). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Id. at 1266 (quotation marks omitted). The reasonableness of the force used is "judged

_____

[7]It is undisputed that Cannaday was acting within the scope of his discretionary authority and used deadly force when he shot Nicarry and also that the shooting constituted a "seizure" within the meaning of the Fourth Amendment.

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "'must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.'" Carr v. Tatangelo, 338 F.3d 1259, 1267-68 (11th Cir. 2003) (quoting in part Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989)).

It is not constitutionally unreasonable for an officer to use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," or "if the suspect threatens the officer with a weapon . . . and if, where feasible, some warning has been given." Tennessee v. Garner, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985); see also Long v. Slaton, ___ F.3d ___, No. 06-14439, 2007 WL 3407680, at *2 (11th Cir. Nov. 16, 2007); Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2006).

The evidence, even viewed in the light most favorable to Nicarry, shows that Cannaday's use of force was objectively reasonable because Cannaday had probable cause to believe that Nicarry posed a threat of serious physical harm to Cannaday and his fellow officers on the scene. Nicarry led police on a night-time motor vehicle pursuit and then a foot chase through a quiet residential

8

neighborhood. During the chase, Nicarry refused to pull over and had fled from officers, first in his van and then on foot. Cannaday and the other officers found Nicarry hiding in a dark shed in the backyard of a residence. As the officers arrived, they formed a rough semi-circle between ten and fifteen feet from the shed door. Nicarry was commanded to come out of the shed, but did not do so. Within seconds of being commanded a second time to come out of the shed, Nicarry, a very large man, charged from the shed at full speed while holding a screwdriver and ran in the general direction of at least some of the officers. Nicarry admitted not only that he was running full speed, but that he leapt off a lawnmower as he charged out. Although Cannaday had his gun drawn, he did not fire until he saw the metal object in Nicarry's hand and heard someone call out a warning about a screwdriver.

We stress that, even under Nicarry's version of events, the entire episode after the second command lasted only a few seconds and only a few feet separated Nicarry and the officers who were trying to apprehend him. Given the split-second, rapidly escalating nature of the situation, we conclude that a reasonable officer in Cannaday's shoes could have perceived that Nicarry posed an immediate threat of serious physical harm to himself and his fellow officers. Specifically, it was reasonable, under the circumstances of Nicarry's earlier flight in his van and

9

on foot and his refusal to come out of the shed when first ordered to do so, to believe that Nicarry intended to evade capture and flee and to use the screwdriver as a weapon against any of the officers clustered around the shed that got in his way.

Nicarry argues that, because it was dark in the backyard and the screwdriver was rusty, it would have been difficult to see the object in his hand. While we must draw all reasonable inferences in favor of Nicarry, the fact that it was dark when Nicarry ran out of the shed does not create a genuine issue of material fact as to whether Cannaday actually saw a metal object in Nicarry's hand before firing his gun. The undisputed record shows that Nicarry was illuminated by Smith's flashlight, that Nicarry held the screwdriver in plain sight and that Cannaday saw a metal object in Nicarry's hand.

Nicarry emphasizes that he was shot in the back, raising a reasonable inference that Nicarry was not running directly at Cannaday when he fired the gun. However, an officer's reasonable use of deadly force is not limited to protecting himself from serious physical harm. An officer may also reasonably use deadly force if he has probable cause to believe that a suspect poses an imminent threat of serious physical harm to his fellow officers. It is undisputed that other officers

10

were within a few feet of Nicarry as he charged out of the shed with a screwdriver.[8]

Because the facts as alleged by Nicarry failed to establish a Fourth Amendment violation, the district court correctly concluded that Cannaday is entitled to qualified immunity and properly granted Cannaday summary judgment.[9] Furthermore, because Nicarry failed to show a constitutional deprivation, the district court properly granted summary judgment to Eslinger on Nicarry's failure-to-train claim.  See Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005) (explaining that a supervisory liability claim for failure to train necessarily fails when there is no Fourth Amendment violation).

**AFFIRMED.**

---

[8]Because it is undisputed that Nicarry was only a few feet away from the officers when he charged out of the shed at a full run, a reasonable jury could not find that it was feasible for Cannaday to give a specific warning about the use of deadly force before firing his gun.

[9]Because we conclude that Nicarry failed to show Cannaday's use of force violated Nicarry's Fourth Amendment rights, we do not address the second prong of the qualified immunity analysis–whether Cannaday's use of force violated clearly established law.